# In the United States Court of Federal Claims

### No. 12-204C
### (Filed: October 27, 2015)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * | * |
| | *     **Contract Disputes Act, 41 U.S.C.** |
| **DMS IMAGING, INC.,** | *     **§ 7100 et seq; Breach of** |
| | *     **Contract; Risk of Loss Clause;** |
| **Plaintiff,** | *     **Specific Performance; Prompt** |
| | *     **Payment Act, 31 U.S.C. §** |
| **v.** | *     **3902(a); Constructive** |
| | *     **Termination; Frustration of** |
| **THE UNITED STATES,** | *     **Purpose Doctrine; Damages;** |
| | *     **Causation; Foreseeability;** |
| **Defendant.** | *     **Reasonable Certainty; Interest;** |
| | *     **Attorney's Fees.** |
| * * * * * * * * * * * * * * * * * * * * * * * * * | * |

Mark J. Fink, Cozen O'Conner, The Army Navy Building, 1627 I Street NW, Suite 1100, Washington, D.C. 20006, for Plaintiff.  Philip T. Carroll and Marisa L. Saber, Cozen O'Conner, 333 W. Wacker Dr., Suite 1900, Chicago, IL 60606, for Plaintiff.

Benjamin Mizer, Robert E. Kirschman, Jr., Martin F. Hockey, Jr., and Michael D. Austin, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, P.O. Box 480, Ben Franklin Station, Washington, D.C. 20044, for Defendant.

---

## OPINION AND ORDER

---

**WILLIAMS**, Judge.

    This Contract Disputes Act ("CDA") case comes before the Court following a trial on damages.  In a previous opinion this Court found Defendant liable for breach of contract.  DMS Imaging, Inc. v. United States, 115 Fed. Cl. 794 (2014).  Plaintiff, DMS Imaging, Inc. ("DMS") claims damages for itself and as a pass-through for its insurer, United States Fire Insurance Company ("USFIC"), stemming from the Government's breach of a lease agreement for a magnetic resonance imaging ("MRI") mobile unit.  Plaintiff claims damages of $907,209.33, consisting of $713,823.33 for the fair market value of the MRI unit, $416,000 for eight months of unpaid lease payments, and $2,886 for travel expenses to investigate damage to the unit, minus $500 for the salvage value of the unit and $225,000 received from a tort settlement with a

third party.[1]  Additionally, Plaintiff claims late payment fees and service fees on the unpaid lease payments, and attorney's fees and costs under the contract.  Finally, Plaintiff claims interest under the CDA.

The Court awards Plaintiff its claimed damages of $907,209.33. In addition, Plaintiff is entitled to reasonable attorney's fees and litigation costs, and contractual late payment fees and service fees on the eight unpaid lease payments in an amount to be determined in further proceedings.  Plaintiff may be entitled to interest calculated pursuant to 41 U.S.C. § 7109(a)(1) so long as such interest does not constitute "payment of interest on interest liability."  See Stone Forest Indus., Inc. v. United States, 973 F.2d 1548, 1553-54 (Fed. Cir. 1992).

## Findings of Fact[2]

### Formation of the Parties' Contract and Key Terms

On September 16, 2008, DMS and the United States Department of Veterans Affairs ("VA") entered into contract number VA248-08-RP-0455.  DX 1.1.  This contract was a sole-source contract based on the VA's need for a mobile MRI unit.  Tr. 55-56.  Both parties signed the first page of the contract, Standard Form 1449 ("SF 1449").  DX 1.1.  Contracting Officer

---

[1]     Plaintiff's $907,209.33 demand constitutes DMS's damages computed in accordance with the contract's express terms.  This figure can also be broken down into DMS' insured losses and its losses not covered by insurance. Insured losses were computed by adding $605,490 for the cash value of the MRI unit plus $208,000 for four months of lease payments and $2,886 for investigation expenses, and then subtracting $100,000 for DMS' insurance deductible for a total of $716,376.  To compute its uninsured losses, DMS added $208,000 for four months of unpaid rent plus $100,000 for DMS' insurance deductible plus $108,333.33 representing the difference between the actual cash value and the fair market value of the MRI unit for a total of $416,333.33.  Adding together the insured and uninsured totals, DMS' claimed losses amount to $1,132,709.33, from which DMS subtracts $500 for the salvage value of the MRI unit and $225,000 for its prior tort settlement, arriving at a total of $907,209.33.  Tr. 236-38.

DMS inconsistently suggests that it is entitled to add $100,000 representing its deductible to the $907,209.33 total, which would yield a recovery of $1,007,209.33, but then does not include this extra $100,000 in its damages claim.  Compare Pl.'s Post-Trial Br. 8-9 with Pl.'s Post-Trial Br. 2, 15-16.  The Court finds that DMS is not entitled to an additional $100,000 representing its deductible given that this amount is not a proper element of damages under the contract, and is in any event, subsumed within DMS' claim for $907,209.33.

[2]     These findings of fact are derived from the record developed during a three-day trial and from the Court's summary judgment opinion on liability, DMS Imaging, Inc. v. United States, 115 Fed. Cl. 794 (2014). Additional findings of fact are in the discussion.  The Court uses "PX" to cite Plaintiff's exhibits and "DX" to cite Defendant's exhibits.  At trial, Plaintiff called Jeff Axelrod, Connie Hammes, and John Petrillo as fact witnesses and Jerome Hammar as an expert witness in the field of "equipment assessment and evaluation."  Tr. 335.  Defendant called Awilda Perales as a fact witness and did not call any expert witness.

Awilda Perales signed on behalf of the VA, while Jeff Axelrod signed on behalf of DMS.  Ms. Perales was a supervisory contract specialist and contracting officer and Mr. Axelrod was DMS' senior vice president. Tr. 13, 254.  Under "Schedule of Supplies/Services," the contract stated:

> LEASE ON ONE (1) SIEMENS MOBILE MRI SYSTEM TO RADIOLOGY SERVICE AT VA CARIBBEAN HEALTHCARE SYSTEM, SAN JUAN, PUERTO RICO IN ACCORDANCE WITH APPROVED CONTRACTOR'S LEASE AGREEMENT 090408A AND ATTACHED CONTRACT TERMS AND CONDITIONS.

DX 1.1.  Under this contract, the VA agreed to lease DMS' MRI unit for a period of nine months, paying $65,000 for the first month and $52,000 for each month thereafter.  DX 1.3. The lease agreement also contained the specification details of the MRI mobile unit in an "Equipment Description" attached as Exhibit A.  DX 1.15-1.23.

The parties revised the lease agreement three times, altering the equipment components of the MRI mobile unit.  Tr. 61; DX 1.8.  In its final version, "Revision 4," the lease agreement placed the responsibility for keeping the MRI mobile unit in good repair on DMS. DX 1.8.  The Risk of Loss clause in the lease agreement addressed damages and destruction of the unit, stating:

> Lessee shall bear the entire risk of loss, theft, destruction or damage of the leased property from any cause whatsoever and no loss, theft, destruction or damage of the leased property shall relieve Lessee of the obligation to pay rent or any other obligations under this lease.  In the event of loss, theft, or damage of any kind to the leased property, Lessee, at the option of Lessor, shall place the leased property in good condition and repair, or if the leased property is determined by Lessor to be lost, stolen, destroyed or damaged beyond repair and if requested by Lessor, purchase[] the property at its fair market value immediately preceding the event causing the loss.

DX 1.13-1.14.

The agreement also contained two clauses regarding insurance – a clause requiring the VA to maintain liability insurance and property insurance policies on the full replacement value of the MRI unit and a clause requiring the VA to name DMS as an additionally insured party under an extended insurance policy:

> Department of Veterans Affairs is self insured.  Lessee shall maintain, at its cost[], comprehensive professional liability insurance coverage for any current or future claim, in an amount of not less than that amount required by appropriate law, and if none, then not less than $1,000,000.00 per occurrence, $3,000,000.00 in an aggregate amount, and a minimum of $2,500,000.00 umbrella policy coverage with respect to the activities of the Lessee, and shall name the Lessor as an additional insured.  The Lessee will, at its cost, maintain full property insurance on the leased property.  The property insurance will be for the full replacement value in an amount not less than $2,000,000.00 . . . . The Lessor will be named as loss payee on the property policy.  The proceeds of such coverage, in

the event of loss or damage, shall be applied, at the Lessor's option, to the repair or replacement of the property affected.   Lessee shall provide to Lessor a certificate evidencing liability and property insurance.

DX 1.10.

The Lessee will at its own expense purchase and maintain extended insurance coverage on the leased property naming Lessor as an additional insured.   The proceeds of such coverage, in the event of loss or damage, shall be applied at the Lessor's option, to the repair or replacement of the property affected.   The Lessee shall be responsible for any loss or damage to the property from any cause whatsoever not included under fire and extended coverage insurance.   [. . .]

DX 1.13.

With respect to late lease payments, the lease agreement provided:

A late charge of five percent (5%) of any payment not paid when due as compensation for Lessor's internal operating expenses arising as a result of such delayed payment, plus a service charge of 1 ½ % per month, not to exceed the maximum amount allowed by law, shall be made on any portion of the Lessee's outstanding balance which is not paid when due whether such payments are due prior to or after a Default.   The lease is a net lease and Lessee shall not be entitled to any abatement of, reduction of, or setoff against Lease Payments for any reason whatsoever.

DX 1.12.

Finally, the lease agreement set forth the following rights of DMS, the lessor, in the event of breach:

LESSOR shall be entitled to exercise all rights and remedies under law upon breach by Lessee of any terms or conditions herein.   In the event that legal or other action is required to enforce Lessor's rights hereunder, Lessee agrees to reimburse LESSOR on demand for its reasonable attorneys' fees and other related costs and expenses.

DX 1.14.   The lease agreement also contained a severability clause indicating that if any portion of the agreement were to be found unenforceable or void, that portion would be severable from the rest of the agreement.   Id.

At trial, Ms. Perales, the VA's Contracting Officer, testified that she had assigned this contract to America Quiñones, one of her subordinate contracting specialists, in 2008.   Tr. 57. According to Ms. Perales, Ms. Quiñones "had some questions" about the contract "because she was basically new" and had come to her with "a concern."   Id.   Ms. Perales did not recall what Ms. Quiñones' concern was.   Id.   Ms. Perales stated that she had been busy when Ms. Quiñones approached her and that she instructed Ms. Quiñones to review a previous 2006 agreement between the VA and DMS and "just go with it" if the 2006 lease agreement was "similar or the same" to SF 1449.   Id. at 155.   Although Ms. Perales had not been the contracting officer on the

2006 contract, she understood that the service DMS had provided under that contract had been very good. Id. at 125-26. Ms. Perales felt comfortable instructing Ms. Quiñones to use the 2006 agreement as a basis for the 2008 agreement because she did not believe there had been any problems with DMS and its equipment. Id. at 127. Ms. Perales only read the first page of the contract, the SF 1449; she did not read the remainder of the 2008 contract or the attached lease agreement with its terms and conditions before signing it. Id. at 79. Ms. Perales also did not consult with the VA's legal department about the 2008 contract. Id. at 127.

## Arrival and Destruction of the MRI Unit

On or about October 16, 2008, the MRI mobile unit was delivered and accepted by the VA. DMS Imaging, 115 Fed. Cl. at 796. The Radiologic Modalities Supervisor at the San Juan medical center signed the certificate of acceptance for the MRI unit on behalf of the VA, acknowledging its acceptance and the terms of the lease agreement. Id. Within the first month following acceptance, the VA began experiencing "operational issues" with the MRI unit. DX 3.1, 3.5-3.17; Tr. 165-66. DMS sent someone to repair the unit after each of these occurrences. Tr. 166. Although the lease agreement contained an "uptime guarantee" allowing the lessee to seek a rebate for any amount of time that the unit was not operational, the VA did not seek such a rebate.[3] Id.

On December 3, 2008, a fire destroyed the MRI unit. Id. at 81. The fire was found to be "likely accidental" by MDE, Inc., a company hired by the VA to investigate the incident. DMS Imaging, 115 Fed. Cl. at 796; DX 3.27. DMS sent Jeff Strogan, its operations manager, to investigate the damage to the MRI unit in Puerto Rico where he subsequently determined that the unit was a total loss. Tr. 273-74. At that point, Mr. Strogan arranged to take possession of the MRI unit and hired HRT Trucking to transport and store it. Id. at 423. DMS' then-parent company, Otter Tail Corporation ("Otter Tail") also sent its risk manager, Pat Murray, to Puerto Rico in January 2009, to assess the MRI unit's damage. Id. at 418; DX 2.59. DMS ultimately sold the destroyed MRI unit to HRT Trucking for $500 because there was little demand for the machine given "safety concerns" regarding "contamination" and the lack of any useable "assets that could be retrieved from the system." Tr. 424. Messrs. Strogan's and Murray's trip expenses for their investigations totaled $2,886. DX 2.59.

## Aftermath of the Fire and DMS' Insurance

As the VA was self-insured, it did not maintain comprehensive liability insurance naming DMS as an insured. Cf. DX 1.10. At the time of the fire, Otter Tail had a master insurance policy with Crum & Forster, underwritten by USFIC, which covered DMS' equipment including the MRI unit at issue. Tr. 481-83; DX 6; PX D. An endorsement was added to the policy before DMS transported the unit to the VA in Puerto Rico, to ensure that the policy covered equipment in Puerto Rico. Tr. 398-99, 483; DX 6.82. This policy had a deductible of $100,000 and required the "actual cash value" method of valuation to be used in the event of loss. PX D at

---

[3]     In the lease agreement, DMS guaranteed that the unit would be operational 90% of the time, subject to certain limitations, and agreed to grant a rebate "equal to the daily prorated rental rate of the Leased Property for each 1.0% percentage or prorated part thereof below 90%." DX 2.40. This rebate was the lessee's "exclusive remedy" for operational downtime. Id.

223, 258; Tr. 401, 488.  The policy defined "actual cash value" to be "[t]he amount it would cost to repair or replace insured property, on the date of loss, with material of like kind and quality, with proper deduction for obsolescence and physical depreciation." PX D at 258.

According to Ms. Connie Hammes, DMS' asset manager charged with tracking the movement of mobile MRI units between facilities, DMS decided to make a claim under this policy for the MRI unit "because the VA was not willing to follow through with the terms of the contract [DMS] had with them."  Tr. 386, 401-02.  Crum & Forster paid $716,376 to Otter Tail for the net loss of the MRI unit – $816,376 for the unit minus DMS' $100,000 deductible.  DX 2.56.  The $816,376 included $605,490 for the cash value of the MRI unit, $208,000 for four months of lease payments at $52,000 per month, and $2,886 for investigation expenses.  DX 2.56, 2.59.  Crum & Forster issued a check to Otter Tail in the amount of $716,376 on June 29, 2009, and this amount was endorsed to DMS.  PX F at 2; DX 2.58.  Ms. Hammes testified that DMS' "intent upon receiving further settlement was to reimburse Crum & Forster for their expense" so that DMS would avoid double recovery.  Tr. 427.

On December 12, 2008, DMS informed the VA that the lease provisions incorporated into the contract required the VA to insure the MRI unit and that the risk of loss was on the VA, and that DMS expected payment for the "full replacement cost" of the destroyed MRI unit. DMS offered to provide a replacement unit so MRI services could continue at the VA.  DX 4.1-4.2.  Over three months later on March 19, 2009, Ms. Perales responded to DMS' letter, denying that the risk of loss rested on the VA and indicating that while the VA was interested in a replacement "no official request was originated."  DX 5.1-5.2.

In the Spring of 2009, the VA requested proposals for another mobile MRI unit.  DMS provided a new lease offer.  PX C at 2.  In April 2009, Ms. Perales determined that there was a Service-Disabled Veteran Owned Small Business ("SDVOSB") that provided MRI leasing and found that the SDVOSB's estimate would be more cost effective than DMS' and would further the VA's socioeconomic goal of using veteran-owned businesses.  Id. at 1.  Although Ms. Perales had requested authorization to begin the termination for convenience process "on the previous contract . . . ," the VA never formally terminated the contract, either for cause or convenience.  Tr. 178, 205.

DMS itself had leased the MRI unit as part of a master lease agreement with Bank One, originally signed in July 2000, and on March 26, 2004, DMS entered into a Lease Schedule and paid $23,320 per month for this unit for 66 months.  DX 7.1; PX L at 1, 8-10.  DMS was required to make this lease payment even in the event the unit was destroyed.  DX 7.8-7.10; PX L at 8; Tr. 392-93.  Additionally, if the unit could not be returned to Bank One, DMS was responsible for buying the unit at the end of the lease term.  Tr. 393.

Following the fire, DMS bought the destroyed MRI unit from Bank One in February 2009, for $608,806.44.  Id. at 402; PX T.  After the fire, DMS pursued a tort action, claiming a design defect or improper manufacture of the MRI unit and received a settlement of $225,000. See DX 3.3; Tr. 424-25. After the fire destroyed the MRI unit, the VA discontinued payments on the lease with DMS and did not pay DMS the fair market value of the MRI unit.  Tr. 103.

On June 28, 2011, DMS submitted a claim under the CDA to Contracting Officer Perales seeking $954,176 – $716,376 paid by Crum & Forster, including the $605,490 for the MRI unit,

and $237,800 for DMS' uninsured damages, consisting of the $100,000 deductible and $137,800 for "[l]ost lease payments for April, May with late fees and interest." DX 2.1-2.2. On January 9, 2012, Ms. Perales denied DMS' claim, finding that (1) the contract had been constructively terminated when the fire destroyed the MRI mobile unit, (2) DMS improperly brought a claim on behalf of its insurer, (3) DMS was at fault for any damage, (4) the lease agreement was not enforceable because it was not signed by both parties as required by the availability clause, (5) the contract superseded the lease agreement, (6) the Government was not permitted to enter into an agreement where its indemnification liability was unlimited,[4] and (7) DMS was improperly seeking a double recovery in its CDA claim and in the tort lawsuit. DX 3.1-3.3.

**Expert Testimony Regarding the Fair Market Value of the MRI Unit**

Under the Risk of Loss clause contained in the lease agreement, DMS had the right to require the Government to purchase the property "at its fair market value immediately preceding the event causing the loss." DX 1.13-1.14. Plaintiff's expert in equipment assessment and valuation, Jerome R. Hammar, calculated the MRI unit's fair market value prior to loss. Tr. 336. Mr. Hammar was awarded a Bachelor of Engineering degree from Youngstown State University in 1972. Tr. 321. Mr. Hammar worked as a product engineer and senior product engineer at Delphi, a sales engineer at Diamond Shamrock Corporation, the Vice President of Operations at Schneller, Inc., and the Vice President Operations and Finance and CEO/President at Store Systems & Services, Inc. PX I at 1-2. In 2001, Mr. Hammar founded CEIPS, LLC ("CEIPS") and is currently the CEO and President. Id. at 1.

CEIPS provides "[c]ommercial equipment valuation and pricing service[s] for the insurance property and casualty market nationwide." Id. CEIPS has provided valuation services for many different types of industries, including medical, light manufacturing, heavy manufacturing, service industry, restaurants, hotels, markets, machine shops, off-highway equipment, planetariums, and kosher manufacturing. Tr. 328. CEIPS has performed over 3,400 valuations since its founding, and Mr. Hammar estimated that he has performed over 1,500 personally, 50 of them on medical equipment, including Seimens MRI units like the one in this case. Id. at 328-29, 331-32.

In 2009, Mr. Hammar was retained by Crum & Forster to determine the actual cash value of the MRI unit just prior to its destruction in December 2008, for insurance purposes. Mr. Hammar calculated the actual cash value to be $605,490. In 2014, DMS asked Mr. Hammar to compute the fair market value of the MRI unit as of December 3, 2008, and he determined that $713,823.33 was the fair market value.

Mr. Hammar defined fair market value as "the market value of a used piece of equipment with a willing buyer and seller, neither of them being under duress." Id. at 333-34. Next, Mr. Hammar used "the market approach," or "the availability and sale of like kind and quality of equivalent equipment of similar age, condition, and operating environment," to assess the fair

---

[4]     While the lease agreement contained a provision requiring the VA as the lessee to indemnify the lessor for all claims and/or losses related to the lessee's use of the leased equipment, DMS does not bring any claim against the Government based on this provision. DX 1.13.

market value of the destroyed MRI prior to loss on the date of the fire, December 3, 2008. Id. at 333, 338. Mr. Hammar described this approach is "pretty much standard" in the valuation industry. Id. at 333.

Mr. Hammar started his market value analysis by obtaining the specifications for the unit, including its components, from DMS. Tr. 338-39. The specifications relevant to Mr. Hammar's analysis were the power of the MRI unit, the functionality of the unit, the ability of the unit to make effective finished MRI prints, and the tools necessary for an MRI to focus on specific parts of the body. Id. at 339. Mr. Hammar then called Siemens, the manufacturer of the MRI unit, and learned that this particular unit was made in 2004, was housed in a mobile trailer, had no software upgrades, and no modifications to its components. Id. at 340-42. Siemens informed Mr. Hammar that Siemens had a very similar MRI unit available for sale that had been offered to DMS as a replacement for $810,000, which included a $110,000 maintenance agreement add-on. Id. at 342-44. Mr. Hammar deducted the $110,000 value of this add-on, providing Mr. Hammar with one reference value of $700,000 for the MRI unit. Id. at 343-44.[5]

Mr. Hammar then contacted two other authorized Siemens dealers that sold refurbished MRIs to find prices for comparable units. Id. at 344-47. The first company, Block Imaging, offered a 2002 unit for $595,000. Id. at 348. Because that unit was two years older than the damaged unit, Mr. Hammar made an upward adjustment to this price to $700,490. Id. Mr. Hammar also received a price quote from Barrington Medical for a 2004 unit and added an adjustment for a mobile trailer to calculate a price of $735,400. Id. at 350-51. After obtaining these three price points, Mr. Hammar averaged them to obtain a fair estimate of what "was prevalent and available in the marketplace to replace what was damaged." Id. at 353. Based on this average, Mr. Hammar opined that the fair market value to replace the MRI unit as of December 3, 2008 – the date the fire destroyed the MRI machine – was $713,823.33. Id. at 354.

Mr. Hammar was initially engaged by Crum & Forster in 2009, to determine the actual cash value of the unit for the destroyed MRI unit, as of the date just prior to its destruction on December 3, 2008, for insurance purposes. DX 2.56, 2.60; Tr. 374. During cross-examination, Mr. Hammar was asked to explain why the $605,490 amount he calculated to be the actual cash value of the machine for Crum & Forster differed from his later fair market value of $713,823.33 for DMS. According to Mr. Hammar, actual cash value "is determined as a depreciated value of a piece of equipment taking into consideration age, working conditions, maintenance, environment" and the "effective life of the equipment." Tr. 361. Fair market value, by contrast, does not consider depreciation. Id. In order to compute a fair market value when hired by DMS to do so in May 2014, Mr. Hammar used the information he had previously gathered for Crum & Forster in 2009. Id. at 373. The Government did not proffer any expert testimony to counter Plaintiff's expert's opinion on fair market value.

## Procedural History

Plaintiff filed its complaint in this Court on March 29, 2012, appealing Ms. Perales' denial of its CDA claim and alleging that the VA breached the terms of its contract. The parties subsequently filed cross-motions for summary judgment on liability and, on April 30, 2014, the

---

[5]    In his expert report, Mr. Hammar indicated that the final price of this unit, with delivery, was $705,490.

Court granted in part Plaintiff's motion and found Defendant liable under the Risk of Loss clause.  DMS Imaging, 115 Fed. Cl. at 799.  The Court held that the lease agreement, including the terms and conditions section containing the Risk of Loss clause, was part of the parties' contract.  Id. at 798.  The Court did not reach the issue of whether Defendant was liable for Plaintiff's insurance deductible as the record on that issue was not sufficiently developed.  Id. at 800.  Nor did the Court address Plaintiff's entitlement to damages or the amount of damages.  Id. The Court conducted a trial on damages on September 4, 2014 and October 22-23, 2014.  The parties filed several post-trial motions including motions to amend pleadings out of time, a motion to strike the testimony of Contracting Officer Perales, a motion to dismiss, and a motion for default judgment.

## Discussion

### Defendant's Motion to Dismiss[6]

As part of its Post-Trial Brief, Defendant filed a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) of the Rules of the Court of Federal Claims, asserting that Plaintiff's suit was a request for specific performance guised as a damages action.  Defendant interprets DMS' statements that it is seeking only what it is owed under the parties' contract as a demand that the Court "enforce" the terms of the lease agreement, and force Defendant to lease the MRI machine for the period of time prescribed in the lease agreement.  Def.'s Post-Trial Br. 10-14.  Plaintiff, however, emphasizes that it is not requesting specific performance, but rather seeks only monetary payment "for the express stipulated damages" set forth in the parties' agreement.  Pl.'s Resp. 7-12.

"The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment."  Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006).  On a motion to dismiss for lack of subject-matter jurisdiction, the Court assumes all factual allegations to be true, and will construe the complaint in a light most favorable to the nonmoving party, in this case, DMS. Pennington Seed, Inc. v. Produce Exch. No. 299, 457 F.3d 1334, 1338 (Fed. Cir. 2006).  Plaintiff bears the ultimate burden of establishing jurisdiction by a preponderance of the evidence. Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).

Specific performance is an exceptional contractual remedy only available to an aggrieved party if money damages would otherwise be inadequate to provide it the benefit of the bargain under the contract.  Union Pac. Ry. Co. v. Chi., R. I. & P. Ry. Co., 163 U.S. 564, 600 (1896) ("[S]pecific performance . . . rests on the ground of the inadequacy and incompleteness of the remedy at law.").  Here, money damages are adequate to compensate Plaintiff for an eventuality contemplated and bargained for by the parties – the destruction of the MRI unit while in Defendant's custody.  The parties agreed in the underlying lease agreement to the monetary remedy for an occurrence that transpired – if the MRI unit were destroyed, the Government as

---

[6]     In its Post-Trial Motion to Dismiss, Defendant argued that DMS could not bring suit for the use and benefit of USFIC and suggested that DMS might receive a "double recovery."  Def.'s Post-Trial Br. 19-23.  Defendant has subsequently "expressly withdraw[n]" this argument.  See Def.'s Reply 4.

lessee was to pay the fair market value of the unit, the remainder of the lease payments, late payment fees, and attorney's fees in the event of litigation.   These agreed-upon elements of damages are not a request for performance, but a measure of what is owed in the event the contract is not being performed.

Defendant relies on <u>Massie v. United States</u> to argue that the Court cannot award DMS the damages spelled out in the parties' agreement in lieu of lump-sum damages because this would be equitable "enforcement" of the agreement.  45 Fed. Cl. 213, 215 (1999), <u>rev'd</u>, 226 F.3d 1318 (Fed. Cir. 2000).  In <u>Massie</u>, the Federal Circuit reversed the trial court's breach of contract remedy requiring the Government to purchase an annuity, and held that the imposition of such remedy amounted to an "unambiguous mandatory" duty on the part of the Government akin to specific performance.  226 F.3d at 1322.  The Federal Circuit thus found it beyond the jurisdiction of the Court of Federal Claims to require the Government to purchase a specific financial instrument in lieu of awarding a lump-sum monetary payment – the traditional remedy for breach of contract.  <u>Id.</u>  <u>Massie</u> is inapposite.  Here, the Plaintiff is only seeking, and the Court is only awarding, damages.   Defendant's motion to dismiss for lack of subject-matter jurisdiction is denied.[7]

## There Was Mutuality in the Contract's Formation

In its Post-Trial Briefs, the Government persists in arguing that there was no "meeting of the minds" regarding the applicability of the "terms and conditions" under the lease.  <u>See</u> Def.'s Post-Trial Br. 1-2; Def.'s Reply 1.  The Court resolved this issue in its liability opinion and expressly held that the parties' contract included the attached lease "along with its 'terms and conditions.'"  <u>DMS Imaging</u>, 115 Fed. Cl. at 798.  The Court found Defendant liable under the Risk of Loss clause.  <u>Id.</u> at 799-800.  The Court recognizes that this lease agreement placed significant risk on the VA as the lessee in the event of destruction of the MRI unit.  However, a Contracting Officer with requisite authority entered into this contract and accepted this risk in a sole source situation where a government hospital was in need of a critical diagnostic tool.  The lease agreement for the MRI unit was enforceable, partially performed, and clearly breached.  Once the unit was destroyed, the VA had the contractual obligation to reimburse DMS the unit's fair market value and other agreed-upon payments.  DMS' entitlement to damages and the amount of damages are the only issues before this Court.

---

[7]      In seeking dismissal, Defendant argued in its Reply that because Plaintiff's CDA claim to Contracting Officer Perales only included a request for $605,490 for the MRI unit, arguably Plaintiff's claim for the fair market value in the amount of $713,823.33 constituted a new claim which had not been presented to the contracting officer for decision.  Def.'s Reply 7.  The Court does not view this increase in the quantum sought as a new claim.   Plaintiff asked the Contracting Officer and this Court to reimburse it for the amounts due as specified by the contract.  <u>See</u> <u>Quimba Software, Inc. v. United States</u>, 120 Fed. Cl. 107, 112 (2015) (finding that a claim for relief presented to this Court need not be voiced in the exact same language as the original claim before the Contracting Offer, so long as the two claims are grounded in the same underlying facts and require the same kind of proof (citing <u>Scott Timber Co. v. United States</u>, 333 F.3d 1358, 1365 (Fed. Cir. 2003); <u>Affiliated Constr. Grp., Inc. v. United States</u>, 115 Fed. Cl. 607, 612 (2014))).

## Damages for Breach of Contract

The non-breaching party is entitled to expectation damages, i.e. relief "sufficient to place the injured party in as good a position as he or she would have been had the breaching party fully performed." San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) (citing Estate of Berg v. United States, 687 F.2d. 377 (Ct. Cl. 1982)).

To recover expectation damages for a breach of contract, a plaintiff must establish that (1) the breach caused the requested damages; (2) the damages were reasonably foreseeable at the time the contract was formed; and (3) the measure of damages are reasonably certain. See, e.g., SGS-92-X003 v. United States, 118 Fed. Cl. 492, 524 (2014) (citing Kan. Gas & Elec. Co. v. United States, 685 F.3d 1361, 1369 (Fed. Cir. 2012) (internal citations omitted)) Causation, foreseeability, and proof of damages are issues of fact. See Anchor Sav. Bank, FSB v. United States, 597 F.3d 1356, 1361 (Fed. Cir. 2010). Plaintiff has the burden of proof on the three elements. SGS-92-X003, 118 Fed. Cl. at 524 (citing Yankee Atomic Elec. Co. v. United States ("Yankee II"), 536 F.3d 1268, 1273 (Fed. Cir. 2008).

## The Court Awards Plaintiff the Fair Market Value of the MRI Unit

Plaintiff claims damages of $713,823.33 for the fair market value of the MRI unit. Under the Risk of Loss clause, Defendant agreed to pay for the MRI unit "at its fair market value immediately preceding the event causing the loss." DX 1.13-1.14.

## Causation

Plaintiff has the burden of proving that its damages resulted from the Government's breach of the agreement. The Court must determine which legal standard to apply in assessing causation, as it has discretion to choose from the "but for" or "substantial factor" standard. See Citizens Fed. Bank v. United States, 474 F.3d 1314, 1318 (Fed. Cir. 2007) ("[T]he selection of an appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion."). Under the "but for" test, the plaintiff must show that the claimed losses "would not have occurred but for the breach," although the breach need not be the sole cause to recover damages. Cal. Fed. Bank. v. United States, 395 F.3d 1263, 1268 (Fed. Cir. 2005); Anchor Sav. Bank, FSB v. United States, 81 Fed. Cl. 1, 60 (2008). The plaintiff must further show that damages flow "inevitably and naturally" from the breach. Citizens Fed. Bank, 474 F.3d at 1318 (quoting Myerle v. United States, 33 Ct. Cl. 1, 27 (1897)). On the other hand, "[t]he substantial factor standard is properly invoked when the parties assert multiple possible causes for the claimed damages." Am. Sav. Bank, F.A. v. United States, 98 Fed. Cl. 291, 301 (2011) (citing Citizens Fed Bank, FSB v. United States, 59 Fed. Cl. 507, 514-16 (2004)).

Here, the Court will apply the "but for" standard, as Plaintiff does not assert that any factor other than the Government's refusal to pay Plaintiff under the terms of the lease agreement constituted the breach. Specifically, the instant breach occurred after the MRI unit was destroyed by virtue of Defendant's failure to honor its obligations under the express terms to the lease – to pay the fair market value of the machine, the remaining lease payments due, and any late payments and other fees. Pl.'s Post-Trial Br. 3. The but for causation of Plaintiff's loss is obvious here. The risk of destruction of the MRI unit was contemplated in the parties' lease

agreement and assigned to the VA as the Lessee.   Defendant's failure to pay the specified damages caused Plaintiff's loss.

**Foreseeability**

Foreseeability means that "the injury actually suffered must be one of a kind that the defendant had reason to foresee and of an amount that is not beyond the bounds of reasonable prediction." Citizens Fed. Bank, 474 F.3d at 1321 (quoting Joseph M. Perillo, 11 Corbin on Contracts § 56.7 at 108 (2005 rev. ed.)).   Damages must be "reasonably foreseeable by the breaching party at the time of contracting." Vt. Yankee Nuclear Power Corp. v. Entergy Nuclear Vt. Yankee, LLC, 683 F.3d 1330, 1344 (Fed Cir. 2012) (internal citations and quotation marks admitted).   "[T]he particular details of a loss need not be foreseeable," as long as the "specific mechanism of loss" was foreseeable. Anchor Sav. Bank, FSB, 597 F.3d at 1362, 1364.   The terms of the lease agreement themselves made Plaintiff's claims foreseeable – the parties agreed what the monetary measure of damages would be in the event of the destruction of the unit.   This contract and lease agreement contemplated that there could be a loss or destruction of the MRI unit and placed the risk of that loss on the VA, providing that the VA had to pay the lessor the fair market value of the unit and other specified payments in the event such loss occurred.

**Reasonable Certainty**

A plaintiff must show a damages amount with reasonable, not absolute, certainty, "[i]t is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation." Elec. & Missile Facilities v. United States, 416 F.2d 1345, 1358 (Ct. Cl. 1969) (quoting Specialty Assembling & Packing Co. v. United States, 355 F.2d 554, 572 (Ct. Cl. 1966); WRB Corp. v. United States, 183 Ct. Cl. 409, 425 (1968)).   "If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery."   Ace-Federal Reporters, Inc. v. Barram, 226 F.3d 1329, 1333 (Fed. Cir. 2000) (quoting Locke v. United States, 283 F.2d 521, 524 (Ct. Cl. 1960)).

Mr. Hammar, Plaintiff's expert in equipment assessment and valuation, testified as to the fair market value of the MRI unit and his method of calculating this value.   Mr. Hammar defined three ways to value the MRI unit on December 3, 2008:  actual cash value of the destroyed MRI accounting for depreciation ($605,490), fair market value of a similar used MRI unit ($713,823.33) and replacement cash value to purchase a new MRI machine ($1,455,990).  Tr. 354, 366, 370-71.  The Court found Mr. Hammar credible and his determination of a fair market value of $713,823.33 to be well reasoned and supported by his research on comparable MRI units.  Mr. Hammar clearly and competently described his valuation process and how the fair market value of the unit was calculated.   The Court accepts Mr. Hammar's uncontroverted valuation and finds that the fair market value of the MRI unit as of December 3, 2008, was $713,823.33.   DMS' damages for the fair market value were caused by the breach, were foreseeable at the time of contracting, and have been set forth with reasonable certainty through the work of Mr. Hammar.

Defendant attacks DMS' entitlement to damages representing the fair market value of the MRI unit on the basis that DMS did not "incur" a loss in this amount.  See Def.'s Post-Trial Br. 19-21; Def.'s Reply 8-10.   Defendant asserts that the most DMS can claim as damages is $608,806.44, representing the payment it made to purchase the MRI unit from Bank One.  Def.'s

Reply 9. However, the value of the unit in the event of loss or destruction was defined by the contract to be the fair market value, not the actual losses incurred by DMS, the actual cash value of the unit paid to DMS through its insurance policy, or the replacement value of the MRI unit. It is not within this Court's purview to rewrite the parties' bargain. Plaintiff is entitled to the fair market value of the MRI unit, as of December 3, 2008, prior to its destruction, in the amount of $713,823.33, as an element of its expectancy damages.

### The Court Awards Plaintiff the Unpaid Lease Payments

Plaintiff claims $416,000 for eight months of unpaid lease payments at $52,000 per month. The parties do not dispute that their contract required the Government to pay $65,000 for the first month of the lease, $52,000 for each of eight months thereafter, and that only the first month was paid. DX 1.3; Tr. 102-03. The parties also do not dispute that the Risk of Loss clause stated that "no loss, theft, destruction or damage of the leased property shall relieve Lessee of the obligation to pay rent or any other obligations under this lease." DX 1.13. Had Defendant performed its obligation as specified in the Risk of Loss clause, Plaintiff would have received the remaining eight months of lease payments. Damages in the amount of $416,000 were thus caused by the breach, foreseeable and reasonably certain, as the obligation to pay the remaining lease payments in the event of loss is expressly set forth in the contract and capable of calculation with precision.

Defendant challenges Plaintiff's entitlement to these damages on multiple fronts. First, Defendant asserts that the Prompt Payment Act, 31 U.S.C. § 3901-07, "precludes the Government from making payment for goods or services not received." Def.'s Post-Trial Br. 23; see also Tr. 103 ("[A]ccording to the Prompt Payment Act, the Government only pays for services delivered."). The heart of the Prompt Payment Act is the requirement that

> [T]he head of an agency acquiring property or service from a business concern, who does not pay the concern for each complete delivered item of property or service by the required payment date, shall pay an interest penalty to the concern on the amount of the payment due. The interest shall be computed at the rate of interest established by the Secretary of the Treasury, and published in the Federal Register, for interest payments under section 7109(a)(1) and (b) of title 41, which is in effect at the time the agency accrues the obligation to pay a late payment interest penalty.

31 U.S.C. § 3902(a) (2012); See generally Ocean Tech., Inc. v. United States, 19 Cl. Ct. 288, 289-90 (1990) (stating that "[t]he Prompt Payment Act provides that a governmental agency shall pay a contractor interest on complete, delivered property or services, with certain exceptions, beginning on the date on which payment should have been made under the contract or 30 days after submission of an invoice.").

The purpose of the Prompt Payment Act is to "provide incentives for the Federal Government to pay its bills on time." Id. at 290 (quoting H. Rep. No. 461, 97th Cong., 2d Sess. 1, reprinted in 1982 U.S. Code Cong. & Admin. News 111). This statutory scheme is not, however, pertinent to the instant case, as Plaintiff does not seek interest under the Prompt Payment Act. There is nothing in the Prompt Payment Act that prohibits the Government from

fulfilling its contractual obligation to pay lease payments on a leased MRI unit when the unit was destroyed while in the Government's possession.

The provision is not unenforceable simply because it was not a particularly favorable term for the Government.  See The Meyer Grp., Ltd. v. United States, 121 Fed. Cl. 105, 123 (2015) (recognizing the binding force of an agreement the Government entered into "without negotiating" or "changing one word of the broker's proposed contractual language.").  On the contrary, when the Government enters the commercial marketplace, it sheds its sovereign mantle and must honor its bargains just as any other contracting party.  United States v. Winstar Corp., 518 U.S. 839, 870-71 (1996) (affirming that when the Government contracts as a private party a Court must apply "ordinary principles of contract construction and breach that would be applicable to any contract action between private parties."); Lynch v. United States, 292 U.S. 571, 579 (1934) ("When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.").

In another tack to avoid these lease payments, Defendant argues that the contract was "constructively terminated" at the time of the fire, advancing the theory that because "[t]he fire destroyed the object of the lease[,]  [t]he Government's obligations under the contract ended at that point."  Def.'s Post-Trial Br. 23.  However, this position is at odds with both the lease agreement and established precedent.  As this Court explained in its liability opinion, the Government may be held liable as a lessee for the destruction of leased property under contract.  DMS Imaging, 115 Fed. Cl. at 799.  For example, in S.W. Aircraft, Inc. v. United States, the Government was held liable for the destruction of a leased helicopter because the Government assumed the risk of loss for all damages to the helicopter that occurred during flights under an elevation level of 500 feet.  551 F.2d 1208, 1211 (Ct. Cl. 1977).  In Container Co. v. United States, the Government leased a building and agreed that it would not overload any leased structure and would "immediately repair" any damage caused by loading.  90 F. Supp. 689, 692-93 (Ct. Cl. 1950).  The building was subsequently destroyed by a fire caused by overloading, and the Court found the Government liable for the cost of repairing or rebuilding the destroyed structure.  Id. at 691-93, 695.

In the instant case, as in S.W. Aircraft and Container Co., the Government entered into a valid contract that put the risk of loss of the leased property on the Government itself.  The Government cannot escape paying what it expressly agreed to pay if the unit were destroyed under the Risk of Loss clause by asserting that the contract constructively ended with the destruction of the MRI unit.  The parties' contract did not leave room for this type of construct – in the event the unit were destroyed, the lease agreement spelled out a continuing obligation which the government breached.

Defendant also invokes the frustration of purpose doctrine to argue that the Government has no obligation to pay the remaining lease payments because the purpose of the contract was frustrated by the fire.  Def.'s Post-Trial Br. 24.  Defendant asserts that "[t]he accidental fire which destroyed the unit was beyond the contemplation of the parties at the time of contracting" and quotes the Restatement (Second) of Contracts:

> Where, after a contract is made, a party's principal purpose is substantially
> frustrated without his fault by the occurrence of an event the non-occurrence of
> which was a basic assumption on which the contract was made, his remaining

14

duties to render performance are discharged, <u>unless the language or the circumstances indicate the contrary.</u>

<u>Id.</u> (citing Restatement (Second) of Contracts § 265 (Am. Law Inst. 1981) (emphasis added)). Here, the language of the contract did "indicate the contrary." <u>Id.</u> A stated recognition of this contract was that the unit might be destroyed. The Risk of Loss clause expressly stated that the Government as lessee would bear the risk of loss for destruction of the unit and that such destruction would not relieve the Government of the obligation to make lease payments. The frustration of purpose doctrine is clearly inapplicable here.

Defendant further argues that Plaintiff's damages must be reduced by lease payments it did not have to make after "buying out" the unit and any maintenance or operating costs it did not have to pay on the unit after the fire. Def.'s Post-Trial Br. 13-14; Def.'s Reply 9-11. As Defendant correctly asserts, "a breaching party [may seek] to offset an award of damages by proving that the non-breaching party has achieved some cost savings because the breach permitted it to avoid . . . some aspect of performance." <u>Energy Nw. v. United States</u>, 641 F.3d 1300, 1306 (Fed. Cir. 2011) (explaining <u>Carolina Power & Light Co. v. United States</u>, 573 F.3d 1271, 1277 (Fed. Cir. 2009)). In <u>Carolina Power</u>, the Government successfully argued that its breach in failing to pick up spent nuclear fuel allowed the plaintiffs to avoid the costs of loading the spent nuclear fuel for shipment to a Government facility, a cost that they were required to cover under the parties' contract. 573 F.3d at 1277. Here, Defendant's failure to pay under the Risk of Loss clause did not, however, allow Plaintiff to avoid any aspect of its own performance. Tr. 288, 392-93. DMS' asset manager, Ms. Hammes, testified that Plaintiff had to make lease payments to Bank One and buy the unit at the end of the lease regardless of the state of the unit. <u>Id.</u> at 392-93. DMS' former senior Vice President, Mr. Axelrod, testified that he "assumed" that Plaintiff still had to pay service charges on the MRI unit after the fire because its service contract with Siemens would have continued even if the unit had been destroyed. <u>Id.</u> at 288-89.

Finally, Defendant argues that Plaintiff is not entitled to the eight months of unpaid lease payments because it has not shown how much of each of the monthly payments would have been profit. Defendant's suggestion that Plaintiff must prove what the individual components of each $52,000 monthly lease payment were and justify that each element is a proper form of damages is incorrect. <u>See</u> Def.'s Reply 10-11. The parties agreed in a valid contract that Defendant would pay $52,000 per month to lease the MRI unit and that Defendant would be responsible for these payments if the unit were destroyed. DX 1.3, 1.13.

The Court awards Plaintiff eight months of unpaid lease payments as these damages were caused by the breach, were foreseeable, and have been calculated with reasonable certainty.

**<u>The Court Awards Plaintiff Late Payment Fees Pursuant to the Contract</u>**

Plaintiff claims entitlement to a monthly 5% late fee and 1.5% service charge on the unpaid lease payments. Section 2.1 of the lease agreement's terms and conditions stated:

Late Payment. A late charge of five percent (5%) of any payment not paid when due as compensation for Lessor's internal operating expenses arising as a result of such delayed payment, plus a service charge of [1.5%] per month, not to exceed the maximum amount allowed by law, shall be made on any portion of the

> Lessee's outstanding balance which is not paid when due whether such payments are due prior to or after a Default.  The lease is a net lease and Lessee shall not be entitled to any abatement of, reduction of, or setoff against Lease Payments for any reason whatsoever.

DX 1.12.  Defendant did not pay lease payments for eight months when due, despite its obligation to continue making these payments under the Risk of Loss clause.  See DX 1.13.

Defendant invokes the Prompt Payment Act to argue that the Court should reject Plaintiff's claim to late fees and service charges it characterizes as interest owing on the unpaid balance.  Def.'s Post-Trial Br. 14, n. 3.  Defendant asserts that Plaintiff "cannot receive [Prompt Payment Act] interest" here.  Id.  Defendant's argument appears to be based on the notion that the Prompt Payment Act is the only way for a contractor to receive these types of payments from the Government and, as Plaintiff does not qualify Prompt Payment Act interest, the contract's late payment provision is not authorized by law.  There is no provision of the Prompt Payment Act, however, that prevents commercial parties and the Government from separately agreeing via contract for the payment of late fees, service fees, or interest.  Here, Plaintiff does not claim Prompt Payment Act interest but instead bases its claim for the late fee and service charge solely on the contract.

"Under the long-standing 'no-interest rule,' sovereign immunity shields the U.S. government from interest charges for which it would otherwise be liable, unless it explicitly waives that immunity[.]"  Sandstrom v. Principi, 358 F.3d 1376, 1379 (Fed. Cir. 2004).  The no-interest rule is codified at 28 U.S.C. § 2516(a), which states:

> Interest on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof.

28 U.S.C. § 2516(a) (2012).

As the statue clearly states, the no-interest rule can be waived by "'specific provision by contract or statute, or express consent by Congress.'"  England v. Contel Advanced Sys., Inc., 384 F.3d 1372, 1379 (Fed. Cir. 2004) (quoting Library of Congress v. Shaw, 478 U.S. 310, 317 (1986) superseded by statute, Civil Rights Act of 1991, Pub. L. No. 102-166, 1-5 Stat. 1079 (internal quotation and alterations omitted)).  The no-interest rule does not act as an absolute bar for a plaintiff to receive interest.  Rather, it is well established that interest can be awarded against the Government if a contract, treaty, or statute expressly provides for the interest payment so long as the provision is "affirmative, clear-cut, [and] unambiguous."  United States v. Thayer-West Point Hotel Co., 329 U.S. 585, 590 (1947).

In the instant case, the contract expressly, affirmatively, and unambiguously requires the Government as lessee to pay a late fee and a service charge on unpaid amounts due.  DX 1.12.  The parties' agreement is explicit on this point.  Id.  Thus, the parties' contract for the lease of the MRI unit operates as a waiver of the Government's sovereign immunity for the payment of these charges even if characterized as interest.  The Court awards Plaintiff its late fees and

service charges under this contract provision, in an amount to be determined in further proceedings.[8]

### The Court Awards Plaintiff Attorney's Fees Pursuant to the Contract

Plaintiff contends that it is entitled to attorney's fees under the contract based on the Risk of Loss Clause and Paragraph 18 of the Terms and Conditions of the Asset Lease Agreement. The Risk of Loss Clause provides that the Government would be liable for "any other obligations under this lease" in the event the MRI unit were destroyed or damaged. PX E. Paragraph 18 of the Terms and Conditions sets forth a fee-shifting obligation, stating:

> LESSOR shall be entitled to exercise all rights and remedies under law upon breach by Lessee of any terms or conditions herein. In the event that legal or other action is required to enforce Lessor's rights hereunder, Lessee agrees to reimburse LESSOR on demand for its reasonable attorney's fees and other related costs and expenses.

DX 1.14.

Plaintiff posits that in signing the lease agreement, the VA expressly consented to be held to this fee-shifting provision in the event of breach. Defendant counters that this Court lacks the power to grant Plaintiff attorney's fees under the lease agreement on two grounds. First, Defendant contends that the Tucker Act does not permit this Court to award attorney's fees because they are unrelated to contract performance and the Government has not waived sovereign immunity for the fee-shifting terms. Def.'s Post-Trial Br. 14-15. Second, Defendant argues that because the Tucker Act does not waive sovereign immunity, the only means for Plaintiff to recover attorney fees is under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412. Defendant contends that DMS would not be an eligible prevailing party under EAJA because its net worth exceeds $2 million. Id. at 16-17.

### This Court May Award Attorney's Fees Expressly Bargained for in a Binding Contract

Under well entrenched principles of sovereign immunity, the United States cannot be sued without its consent. The Government's consent to be sued for contract damages under the Tucker Act forms the predicate for this Court's jurisdiction. The Tucker Act provides:

---

[8]     In its Reply, Defendant asserts that the Court's liability opinion limited Plaintiff's recovery to the value of the MRI unit and the unpaid lease payments and that Plaintiff's requests for late fees and attorney's fees "fall outside of this Court's limited charter." Def.'s Reply 2-3. In the liability opinion, in the context of analyzing the broad indemnification clause, which purported to subject the Government to unlimited liability, the Court stated that Plaintiff had invoked the Risk of Loss clause, not the indemnification clause. The Court found that the Risk of Loss clause did not violate the Anti-Deficiency Act by subjecting the Government to unlimited liability, in that this clause limited Plaintiff's damages to the value of the MRI unit and the unpaid lease payments. See DMS Imaging, 115 Fed. Cl. at 799. The Court in that context was not limiting the scope of the Risk of Loss clause or establishing a ceiling on Defendant's potential liability and did not preclude Plaintiff from seeking additional damages in the form of late fees, service charges, attorney's fees, and interest. Id.

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (2012).

The Tucker Act statutorily waives the Government's sovereign immunity for a plaintiff's substantive common law contract claims and claims under the Contract Disputes Act, 41 U.S.C. § 7100 et seq.  United States v. Mitchell, 463 U.S. 206, 212 (1983) (internal footnote omitted). The Government's consent to be sued for attorney's fees does not fall under the Tucker Act's general waiver of sovereign immunity, but instead requires the Government to make a separate affirmative waiver.  Library of Cong. v. Shaw, 478 U.S. at 314-15.  This comports with the default "American Rule" that each litigant bear its own legal costs absent a statute or express contractual language to the contrary.  E.g., Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975).  Normally, this separate affirmative waiver for attorney's fees comes in the form of a statute.  See Franklin Fed. Sav. Bank v. United States, 55 Fed. Cl. 108, 123 (2003) ("The law is quite clear that statutory authorization is the sine qua non for recovery of legal costs arising from litigation against the Government.").

At issue here is whether an express fee-shifting term in a lease agreement, signed by the VA's Contracting Officer, constitutes an affirmative waiver of sovereign immunity that subjects the Government to suit for reasonable attorney's fees. The Court of Federal Claims considered an almost identical issue in International Industrial Park, Inc. v. United States, 102 Fed. Cl. 111, 114 (2011), aff'd, 496 Fed. App'x. 85 (Fed. Cir. 2013).  In Industrial Park, the Court awarded attorney's fees holding that an express fee-shifting term in a construction contract constituted an affirmative waiver of the Government's sovereign immunity.  102 Fed. Cl. at 113.  The fee-shifting contract term in Industrial Park provided:

> Attorney's Fees.  In the event of any litigation arising from or related to this [contract], the prevailing party shall be entitled to recover from the non-prevailing party all reasonable costs including attorney fees as provided by law.

Id.

The Industrial Park Court analogized the American Rule requiring litigants to bear their own costs to the no-interest statute that generally bars a party from obtaining awards of interest from the Government absent waiver.  Id. at 114. (citing Library of Cong. v. Shaw, 478 U.S. at 314.  The Industrial Park Court relied upon Library of Congress v. Shaw, where the Supreme Court recognized that "[i]n creating the Court of Claims, Congress retained the Government's immunity from awards of interest, permitting [the award of interest] only where expressly agreed to under contract or statute.  Library of Cong. v. Shaw, 478 U.S. at 317 (citing 28 U.S.C. § 2516(a)) (emphasis added).  From this language, the Industrial Park Court reasoned that because Congress may "authorize interest awards by contract or statute, it similarly may authorize the award of attorneys' fees by either medium."  102 Fed. Cl. at 114.  Thus, the Industrial Park Court held that the Government can affirmatively waive sovereign immunity with respect to attorney's fees in Tucker Act cases either by statute or an express contractual provision.  Id.; accord First

Fed. Sav. & Loan Ass'n of Rochester, 88 Fed. Cl. 572, 583 (2009) (analogizing the American Rule to the no-interest rule, and awarding attorney's fees based on a contract provision in a financing agreement executed by the Government that allowed the prevailing party in any legal action to recoup attorney's fees); Applegate v. United States, 52 Fed. Cl. 751, 759 (2002) (stating "[i]f immunity for interest may be waived by contract, the same must hold true for attorney's fees.").

The Industrial Park Court further found that a contracting officer's general authority to contract on behalf on an agency was sufficient to bind the Government to all of a contract's terms – including attorney's fees – and reasoned that the Government can overcome the American Rule through express contract terms when it "does business on business terms."  102 Fed. Cl. at 114 (quoting United States v. Nat'l Exch. Bank of Balt., Md., 270 U.S. 527, 534 (1926)).  As a 34-year veteran in the government contracts arena with the authority to sign contracts on behalf of the government up to $100 million, Contracting Officer Perales had the requisite authority to bind the Government to the contract. Tr. 32-33, 43.

Based on Library of Congress v. Shaw, it is settled that the Government can, with respect to attorney's fees, like interest payments, waive sovereign immunity by entering into an enforceable contract with an express fee-shifting provision.[9]   Here, the contract expressly provided that upon breach the VA "agrees to reimburse [DMS] on demand for its reasonable attorney's fees."  DX 1.14.  The Court accordingly finds that the Government affirmatively waived its sovereign immunity with respect to the payment of attorney fees by entering into the fee-shifting provision in the lease agreement.

## EAJA Does Not Preclude DMS from Recouping its Attorney's Fees Under the Contract

Defendant argues that EAJA "defines the limits of the waiver of sovereign immunity for the payment of attorney's fees by the United States" and "[a]bsent compliance with [the EAJA] requirements, the United States cannot be liable for the payment of attorney's fees.  Def.'s Post-Trial Br. 16.  As Plaintiff recognizes, EAJA does not limit an agency's "ability to enter into a contract with a fee-shifting provision."  Pl.'s Post-Trial Br. 12.

The Court addressed a similar argument in Industrial Park, where the plaintiff sought attorney's fees both under the terms of its contract with the Government and alternatively under EAJA.  102 Fed. Cl. at 113.   Because the Industrial Park Court found that the plaintiff was entitled to attorney's fees under the contract terms, the Court did not need to address the EAJA issue.  Nor did EAJA prevent the Industrial Park Court from awarding attorney's fees under the contract's terms.  Id. at 113-14.  Here, as in Industrial Park, DMS is only seeking attorney's fees under a contract that expressly provides for such fees and EAJA does not preclude a fee award. Id.

---

[9]     Defendant relies on three cases for its proposition that the Tucker Act does not permit an agency to contract for payment of attorney's fees, Kania v. United States, 650 F.2d 264 (Ct. Cl. 1981), Kurz & Root Co. v. United States, 652 F.2d 69 227 (Ct. Cl. 1981), and S.W. Aircraft, Inc. v. United States, 551 F.2d 1208, 1211 (Ct. Cl 1977).  The Court finds these cases wholly inapposite.

**Plaintiff May be Entitled to CDA Interest**

The Court does not on the current record determine what, if any, CDA interest under 41 U.S.C. § 7109(a)(1) is appropriate.  While it would be "inequitable to permit the government to have the benefit of the wrongfully withheld sums without accrual of interest," it is settled that the CDA "does not authorize payment of interest on interest liability."  See Stone Forest Indus., Inc. v. United States, 973 F.2d 1548, 1553-54 (Fed. Cir. 1992).  In Stone, the Federal Circuit reversed a trial court's award of CDA interest on accrued interest for refund payments from a breach of contract action for purchasing timber.  Id.  The Stone court reasoned that it was bound by the Court of Claims precedent in ACS Construction Co. v. United States, which held that CDA did not expressly authorize interest on accrued interest liability and, therefore, the Government has not waived sovereign immunity for an award of interest on interest liability.  Id. (citing ACS Constr. Co., 230 Ct. Cl. 845, 846 (1982)).  As such, the Court must on further proceedings determine whether any components of Plaintiff's contract damages are properly characterized as interest.

**Conclusion**

Plaintiff has demonstrated entitlement to damages in the amount of $907,209.33, plus reasonable attorney's fees, litigation costs, late fees, services fees, and recoverable CDA interest in an amount to be determined.

Plaintiff shall file a motion for reasonable attorney's fees, litigation costs, late fees, service charges, and interest pursuant to the contract, and CDA interest by **December 11, 2015**.  Defendant shall respond by **January 11, 2016**, and Plaintiff shall reply by **January 26, 2016**.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**